# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 03-6081MN

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Graphics Technology, Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| | * | |
| | * | |
| James E. Ramette, Trustee | * | |
| | * | Appeal from the United States |
| Plaintiff - Appellee, | * | Bankruptcy Court for the |
| | * | District of Minnesota |
| v. | * | |
| | * | |
| Digital River, Inc. | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: March 2, 2004
Filed: March 18, 2004

_____

Before FEDERMAN, MAHONEY, and VENTERS, Bankruptcy Judges.

_____

VENTERS, Bankruptcy Judge.

This is an appeal from an order of the bankruptcy court[1] holding that Digital River, Inc. ("Digital River") was liable to James E. Ramette, the Chapter 7 trustee ("Trustee"), for $97,514.44 in preferential transfers made to it by Graphic Technologies, Inc. ("Debtor"). The fundamental issues on appeal are whether the funds paid to Digital River in the ninety days preceding the Debtor's bankruptcy filing belonged to the Debtor or to Digital River and, if the funds belonged to the Debtor, whether a constructive trust should be imposed in favor of Digital River. For the reasons stated below, we affirm the order of the bankruptcy court.

## I. STANDARD OF REVIEW

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013. Findings of fact are reviewed for clear error, and legal conclusions are reviewed *de novo*. *Blackwell v. Lurie (In re Popkin & Stern)*, 223 F.3d 764, 765 (8th Cir. 2000); *Official Committee of Unsecured Creditors v. Farmland Industries, Inc.*, 296 B.R. 188, 192 (B.A.P. 8th Cir. 2003). Matters committed to the bankruptcy court's discretion will be reversed only if the court has abused its discretion. *C.T. Development Corp. v. Barnes (In re Oxford Development, Ltd.)*, 67 F.3d 683, 685 (8th Cir. 1995); *City of Sioux City, Iowa v. Midland Marina, Inc. (In re Midland Marina, Inc.)*, 259 B.R. 683, 686 (B.A.P. 8th Cir. 2001).

## II. BACKGROUND

Tech Squared, Inc. ("Tech Squared") entered into a credit card processing agreement with Paymentech Co. ("Paymentech") prior to 1999. That agreement

---

[1] The Honorable Nancy C. Dreher, United States Bankruptcy Court for the District of Minnesota.

provided that Paymentech would hold a portion (3%-5%) of each credit card sale in reserve for six months to cover chargebacks. After six months, Paymentech would disburse the funds to Tech Squared. Eventually, Digital River, a sister company to Tech Squared, was informally added to the same merchant account.[2] Digital River and Tech Squared – apparently without the involvement or approval of Paymentech – worked out an arrangement whereby all of their credit card sales would be processed through the Paymentech account and Tech Squared, upon receipt of the reserve funds each month, would apportion to Digital River the portion of the reserve account disbursements related to Digital River's credit card sales. At all times, however, the name of the account holder was Tech Squared, and at no time was Digital River a party to the credit card processing agreement with Paymentech.

On December 10, 1999, the Debtor formed T2Acquisition Corporation and acquired all the assets of Tech Squared. As part of the asset sale and purchase agreement, the Debtor assumed Tech Squared's credit card processing agreement with Paymentech; thus, the Debtor acquired and maintained sole control over the right to receive disbursements from the reserve account.[3] Not wanting to share a credit card processing account with the Debtor, Digital River subsequently entered into a separate agreement with Paymentech in January 2000. In the six months preceding January 2000, several hundred thousand dollars was held by Paymentech in the reserve account with respect to Digital River's credit card sales. This money was duly disbursed by Paymentech to the Debtor under the prior agreement – not to Digital River. The disbursed funds actually were placed in the Debtor's deposit

---

[2] Digital River provides web-hosting services to vendors that sell products over the internet. Both Tech Squared and Digital River were operated by the same chief executive officer, and Tech Squared had an ownership interest in Digital River.

[3] At the time of the acquisition, the Debtor knew from an examination of its books that $25,000.00 of the reserve account belonged to Digital River. This amount was duly paid to Digital River.

account, and the Debtor's secured lender swept – daily – all the money deposited therein and applied that money to the Debtor's loan balance. The Debtor then borrowed money from the lender to pay for its business operations.

In June 2000, Digital River notified the Debtor that approximately $660,000.00 that had been withheld by Paymentech in the reserve account and subsequently disbursed to the Debtor rightfully belonged to Digital River. The Debtor acknowledged that some of the funds belonged to Digital River, and also acknowledged that it had used the funds for its own operations. Because the Debtor lacked the money to make immediate payment, the parties entered into an agreement on or about June 30, 2000, for repayment of the amount owed. (Appellant's App. A-62). The agreement provided for numerous methods of reimbursement, including, *inter alia,* an immediate payment of $25,000.00; transmittal by Paymentech to Digital River of the Debtor's reserve rebates for July, August, and September of 2000; and weekly payments of $25,000.00. After the Debtor filed bankruptcy on December 20, 2000, the Trustee sought to avoid $97,514.44 in payments that had been made to Digital River from the Debtor's reserve rebates pursuant to this agreement within the ninety days preceding the filing of the Debtor's bankruptcy petition.

## III. DISCUSSION

The parties stipulated that payments made during the preference period totaling $97,514.44 met all but one of the statutory requirements to make them avoidable preferential transfers under 11 U.S.C. § 547.[4] The dispute in this case concerns

---

[4] That section provides:

[T]he trustee may avoid any transfer of an interest of the debtor in property--
    (1) to or for the benefit of a creditor;

4

whether the funds in the reserve account were the property of the Debtor, and if so, then whether a constructive trust should be imposed on the funds for the benefit of Digital River.

**A. Legal Title to Digital River's Funds in the Reserve Account**

As an initial matter, we agree with Digital River that the Debtor never obtained legal title to the funds deposited in Paymentech's reserve account that were generated by Digital River's credit card sales.

As defined by statute, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Thus, before the Trustee may recover preference payments made by the Debtor to Digital River, the property transferred must have belonged to the Debtor in the first instance, because to the extent an interest in property is limited in the

---

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made--
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if--
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Debtor, it is equally limited in the hands of the estate. In fact, this well-settled maxim is codified in Section 541 of the Bankruptcy Code:

> (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).

Logically, property in which the Debtor has no interest would never become property of the bankruptcy estate. In this case no evidence exists showing that Digital River ever intended to transfer ownership to the Debtor of the money held in reserve from its credit card transactions. The mere fact that the Debtor had exclusive control of the reserve account disbursements does not equate to ownership of all items in that account. It is axiomatic that a mere possessor of the property of another, without more, cannot obtain legal title. In the absence of any title in the Debtor, Digital River's money – to the extent that it might have existed on the Debtor's petition date – never became part of the bankruptcy estate.

**B. Tracing**

Despite the fact that the Debtor never had legal title to Digital River's funds disbursed from the credit card processing reserve account, the evidence plainly supports the bankruptcy court's conclusion that the $97,514.44 in preference period payments belonged to the Debtor before those payments were made to Digital River.

To reclaim money or property from a bankruptcy estate on the basis that the property belongs to the reclaiming party and not to the debtor, the reclaiming party

6

must be able to definitively trace its property. *Fore Way Express, Inc. v. Mid-American Airlines, Inc. (In re Mid-American Lines, Inc.)*, 24 B.R. 52, 53 (Bankr. W.D. Mo. 1982). Even when property is commingled, that property must be positively identified, or else the reclaiming party is relegated to the status of a general unsecured creditor, regardless of the equities. *Id.* The manner in which the debtor or the estate came into possession of the property is irrelevant.[5] *See* 5 *Collier on Bankruptcy* ¶ 541.11[3], p. 541-66 (Lawrence P. King et al. eds., 15th rev. ed. Matthew Bender 2003) (stating that even for property acquired by wrongdoing, the creditor must be able to trace its property into the estate). Under Minnesota jurisprudence, tracing of commingled funds is accomplished as follows:

> The trust fund may be recovered back even if it does not so appear that the identical money of the trust fund is in the mixture, if it appears that, since the confusion of the funds there has always remained on hand a balance of the mixture equal to the amount of the trust fund which originally entered into the mixture. But, if at any time the balance has been reduced to a less amount, then the cestui que trust may recover out of the mixture an amount equal to the smallest balance which has remained on hand since the moneys were confused. This rule is based on the presumption that the trustee drew first his own money out of the indistinguishable mass, leaving the trust funds in the balance on hand.

*Bishop v. Mahoney*, 73 N.W. 6, 6 (Minn. 1897). *See also Empire States Surety Co. v. Carroll County*, 194 F. 593, 604-05 (8th Cir. 1912) (stating that the legal presumption is that the holder of commingled funds regarded the law and did not pay out the property belonging to the other, but kept it sacred); *Nash v. Nash*, 388 N.W.2d 777, 781 (Minn. App. 1986) (stating that a party is not required to produce the serial numbers on a bill).

---

[5] Counsel for Digital River stated in oral argument that the Debtor had converted or even stolen the money belonging to Digital River in the reserve account. However, counsel was unable to point to any evidence in the record of criminal or other unlawful activity.

Under the rule in *Bishop*, Digital River can trace into the reserve fund monies disbursed by Paymentech up to the lowest intermediate balance of the reserve account. Unfortunately for Digital River, however, John Harvatine, the Debtor's Chief Financial Officer, testified that after Paymentech disbursed six-month-old money from the reserve account to the Debtor's bank account, the Debtor's secured lender swept out that cash on a daily basis.[6] Because the last credit card transaction that Digital River processed through Tech Squared's agreement with Paymentech occurred no later than the end of January 2000, the last disbursement by Paymentech from the reserve account that included Digital River's funds would have occurred no later than August 2000. Accordingly, by September 2000 – the beginning of the preference period – the Debtor had spent all of Digital River's money and none of the funds disbursed by Paymentech would have been related to Digital River's credit card transactions. All the money held in the reserve account during the preference period rightfully belonged to the Debtor. Therefore, we must affirm the finding by the bankruptcy court that $97,514.44 in preference period payments constituted the property of the Debtor.

---

[6] At oral argument, Digital River attempted to introduce an exhibit showing that in April 2000 Paymentech's credit card reserve account held $381,988.00 in Digital River's funds. Apart from having very little probative value concerning ownership of the money paid from the Debtor to Digital River in the ninety days before the Debtor's bankruptcy in December 2000, the exhibit was not shared with opposing counsel. We will not consider exhibits or evidence introduced for the first time on appeal – especially when that exhibit has not been shared with opposing counsel. *See Huelsman v. Civic Ctr. Corp.*, 873 F.2d 1171, 1175 (8th Cir. 1989) ("An appellate court can properly consider only the record and facts before the [trial court] and thus only those papers and exhibits filed in the [trial court] can constitute the record on appeal.").

## C. Constructive Trust

Finally, there is no basis in this case to impose a constructive trust on the preference period payments in favor of Digital River.

A constructive trust requires, at a minimum, a finding that one party holds legal title to property that was obtained in the commission of some wrong such that the person with legal title must, in equity, return the property to its rightful owner. *Black's Law Dictionary* 314-15 (6th ed. rev. 1990). Although there is no "unyielding formula" under Minnesota law necessary to create a constructive trust, and a court of equity may do so wherever unjust enrichment would otherwise result, *Iverson v. Fjoslien*, 213 N.W.2d 617, 628-29 (Minn. 1973), no constructive trust may be imposed in this case because, as noted *supra*, the Debtor never held legal title to the disputed property, and no trust *res* is clearly identified in the Debtor's bankruptcy estate.[7]

Furthermore, even in the absence of legal title in the constructive trustee and a trust *res*, the Debtor did not engage in any inequitable conduct sufficient to support the imposition of a constructive trust.

Under Minnesota law, a court may impose a constructive trust only when there is clear and convincing evidence that a constructive trust is necessary to prevent

---

[7] We note that a constructive bailment might be more apropos to the facts of this case. *See Dow-Arneson, Co. v. St. Paul,* 253 N.W. 6, 8 (Minn. 1934) (citing *Wentworth v. Riggs*, 143 N.Y.S. 955, 956 (N.Y. App. Div. 1913)). A debtor never obtains legal title to property subject to a bailment. *See, e.g.*, *Norris v. Boston Music Co.*, 151 N.W. 971, 973 (Minn. 1915) ("It has always been the law that a bailor may pursue his property and reclaim it, even in the hands of a good faith purchaser from or under the bailee, unless estopped by his own conduct from causing loss to such purchaser."). Even a constructive bailment, however, would suffer from the lack of a clearly identified *res* in this case.

unjust enrichment and whenever legal title to property is obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of a confidential or fiduciary relationship. *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn. 1983) (citing *Knox v. Knox*, 25 N.W.2d 225, 228 (Minn. 1946)); *Bly v. Gensmer*, 386 N.W.2d 767, 769 (Minn. App. 1986). Unjust enrichment occurs when a claim is based on the failure of consideration, fraud, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another. *Cady v. Bush*, 166 N.W.2d 358, 361-362 (Minn. 1969). To show unjust enrichment, however, more is required than a mere benefit to one party – "it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. App. 2001) (quoting *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981)).

In this case, the Debtor never took affirmative action to wrongfully acquire Digital River's property; rather, the Debtor's alleged misconduct was the failure to affirmatively act under the circumstances. The Debtor knew when it acquired the Paymentech credit card reserve account from Tech Squared that $25,000.00 in the account belonged to Digital River and it duly tendered that amount. John Harvatine, the Debtor's Chief Financial Officer, testified that the Debtor did not know Digital River was "hooked" onto its assumed agreement with Paymentech. In fact, when confronted by Digital River, the Debtor agreed that it owed Digital River money and the parties agreed on a method for repayment. These facts simply do not demonstrate clear and convincing evidence that the Debtor obtained Digital River's property through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of a confidential or fiduciary relationship. The Debtor was not unjustly enriched in the sense that it acted unlawfully or illegally. Furthermore, Digital River bears some responsibility in this case inasmuch as it knowingly consented to having its funds distributed to an account over which it had no control. Additionally, Digital River apparently failed to effectively communicate

10

with the Debtor regarding its ownership of the commingled funds in the reserve account from January to June 2000.  Had Digital River contacted the Debtor before June 2000, perhaps much, if not all, of the current litigation could have been avoided.

Accordingly, we affirm the decision of the bankruptcy court.